JIM LEE WILSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wilson v. Commissioner
Docket No. 5512-75.
United States Tax Court
T.C. Memo 1976-235; 1976 Tax Ct. Memo LEXIS 171; 35 T.C.M. (CCH) 1019; T.C.M. (RIA) 760235; July 27, 1976, Filed James R. Gilreath, for the petitioner. Terrell W. Dahlman, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined deficiencies in the Federal income tax of petitioner for the taxable years 1972 and 1973 in the amounts of $2,167.41 and $1,670.13, respectively. The only issue for decision is whether petitioner is entitled to deduct as travel expenses under section 162(a)(2) [1] amounts expended as a result of petitioner's being away from home in the pursuit of a trade or business during 1972 and 1973. *172 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Jim Lee Wilson (hereinafter referred to as "petitioner") filed individual Federal income tax returns for taxable years 1972 and 1973 with the Internal Revenue Southeast Service Center at Chamblee, Georgia. At the time of the filing of the petition in this case, petitioner's residence was Kingsport, Tennessee. During 1972 and 1973, petitioner's father owned a residence in Kingsport, Tennessee. Petitioner's father had owned the residence for more than ten years at the time of trial, and the utilities were in his name. Petitioner's father had his own source of income and lived in the residence during the years in question. Petitioner worked in Kingsport from 1956 to 1970 in a permanent job with Tennessee Eastman. He left that job to sell cosmetics in the Kingsport area. During most of the period of his employment in Kingsport, petitioner lived with his parents in his father's residence. However, he lived apart from his family for a brief period in 1968 or 1969. Petitioner left Kingsport in 1971 for a temporary *173 job in Chillicothe, Ohio. He obtained the job through Midwest Technical Services, an employee placement agency. The job in Chillicothe lasted only six months. Petitioner continued to maintain a room in his father's residence in which he kept his furniture and for which he paid monthly rent. Petitioner did not abandon Kingsport as his permanent place of residence during the time he worked in Ohio. In December 1971, petitioner obtained employment with Southern Design Services, Inc. (hereinafter referred to as "Southern"), which is located in Spartanburg, South Carolina, a city over 100 miles from Kingsport. Southern is an employee placement agency which furnishes engineers, designers, draftsmen, technicians and clerical help to manufacturing companies and consulting engineers. Southern's business was to serve employers, its "clients," by placing employees with the clients on a temporary basis. Southern hired qualified draftsmen and other employees by advertising in trade magazines. Many contract workers, such as petitioner, subscribed to such magazines so as to be aware of job openings. The job applicants would send resumes to Southern, which matched the qualifications of *174 applicants with openings available. Southern would then notify the applicant with the most recent resume who met the qualifications for a job and ask him if he wanted the job. If so, he would be put on the Southern payroll and placed with the client. Southern had a policy of keeping an employee on a job for the duration of the job, once he was placed there, unless the client objected to the employee. An employee could be hired on a permanent basis by a client if the client so desired, but only after the employee had completed six months' work for Southern. The lengths of the jobs in which the employees were placed by Southern varied greatly. The average job lasted less than eight months. While the length of time an employee would expect to remain on the job was usually not known at the time the assignment was made, it was expected that the job would end within a limited period of time. On December 13, 1971, Southern placed petitioner on a job with Miller & Weaver, consulting engineers, in Birmingham, Alabama. The job lasted two weeks. On December 27, 1971, Southern placed petitioner on a job with Hoechst Fibers, Inc. (hereinafter referred to as "Hoechst"), in Spartanburg, *175 South Carolina. Petitioner was placed in the Drafting and Design Department. He was told his job would be "temporary." Hoechst was in the process of expanding its Spartanburg facility during the years 1968 through 1974, inclusive. Hoechst had a policy of maintaining a limited number of "regular" employees, whom it hired and paid directly. During 1972 and 1973, the number of such regularly employed draftsmen in the Drafting and Design Department was 12. The regular employees were unable to handle the work load during the expansion, so Hoechst augmented the regular work force with draftsmen supplied by Southern. Southern supplied Hoechst with an average of 25 to 30 draftsmen during the period of expansion. The Southern-supplied draftsmen did the same work as the regular employees in the Drafting and Design Department. Although there was some turnover of draftsmen supplied by Southern, those who left did so of their own accord. Petitioner's work at Hoechst included drafting work in connection with the design of buildings and equipment, modification of existing facilities and product design work. Consequently, petitioner like other Southern-supplied draftsmen, could anticipate *176 employment by Hoechst for the duration of a particular project. Such projects might last as long as 18 to 24 months. Petitioner worked with Hoechst during 1972 and 1973. During the period of time petitioner worked at the Hoechst facilities in Spartanburg, he was not obliged to take any other job provided by Southern. Petitioner was considered an aboveaverage worker by Hoechst. As a result, his job was more secure than those of most other Southern employees. All of the employees supplied by Southern under contract with Hoechst were on Southern's payroll. Southern paid petitioner wages of $13,310.89 and $13,017.23 in 1972 and 1973, respectively. The wages included pay for one week's vacation per year, but no other fringe benefits were included. Southern employees did not receive all the benefits that Hoechst employees received. In addition, Southern paid petitioner per diem payments of $2,467.50 and $2,314.14 in 1972 and 1973, respectively. Petitioner included these per diem payments in his gross income for 1972 and 1973. Petitioner claimed deductions in the amounts of $8,890 and $6,750 in taxable years 1972 and 1973, respectively, as ordinary and necessary traveling *177 expenses incurred while away from home in the pursuit of a trade or business. Section 162(a)(2). Respondent disallowed the deductions on the basis that Spartanburg, South Carolina, constituted petitioner's home for tax purposes and that petitioner could not substantiate the amounts in question. At trial it was stipulated that, should the petitioner be found to be entitled to deductions for away-from-home expenses, then the amount of such expenses is $3,500 in each year. OPINION Petitioner worked for Southern, an employee placement concern, beginning in December 1971. Southern provided employees to industrial companies on a "temporary" basis. Petitioner was first placed in a job that lasted two weeks. His next job, in which he was placed by Southern with Hoechst, a chemical company, was likewise intended to be of temporary duration. However, it developed that petitioner was employed with Hoechst throughout 1972 and 1973. The location of petitioner's employment during this period was Spartanburg, South Carolina. Petitioner maintanis that during the period of his employment with Hoechst he was away from his home at Kingsport, Tennessee, on a temporary job. Consequently, *178 petitioner deducted his expenses for meals and lodging in Spartanburg under section 162(a)(2). [2]
Respondent contends that petitioner may not deduct such expenses under section 162(a)(2) because (a) his employment with Hoechst was of permanent or indefinite duration and (b) even if regarded as temporary, petitioner did not have a "home" within the meaning of the statute. In our opinion, the record clearly establishes that when the petitioner was first sent to Hoechst in December 1971, his employment was to be temporary in duration. His employer of record was in the business of supplying "temporary employees." By reason of past experience, as well as the nature of the job, petitioner had no reason to believe that such employment *179 would be of permanent or indefinite duration. The fact that petitioner elected to live in a motel during this period amply confirms his understanding of the nature of the job. At the outset, therefore, petitioner meets one of the tests described in the statute. He was away from his former place of abode on a temporary job. See, e.g., . Secondly, it is our opinion that the petitioner was, in fact, away from home within the meaning of the statute while he was employed in Spartanburg, South Carolina. The fact that "home" was also the residence of his parent does not make it any less the petitioner's home. Petitioner had a room in that home, had moved his furnishings there, and had made it his home for a period of some years. Since the petitioner was unmarried it was all the home that he needed. He contributed to the support of the home and made regular visits to that home while employed in Spartanburg, South Carolina.See . In this respect, the facts are distinguishable from , cert. denied ; *180 and other cases wherein the fact that the taxpayer may have visited the home of a brother or other relative was insufficient to qualify it as the taxpayer's home within the meaning of the statute. During the course of petitioner's employment at Hoechst, it should have become apparent to him that Hoechst was continuing its expansion plans and that his services would continue to be in demand beyond the period of his initial expectations. Petitioner's services were satisfactory to Hoechst, and he was regarded as a good worker. This fact was made known to him. Further, the fact that no Southern-supplied employees were laid off at Hoechst during the period of his employment should have made petitioner aware that his job was "not the sort of employment in which termination within a short period could be foreseen." . Employment temporary at its inception may become indefinite through the passage of time or other factors. ; ; ; *181 . There is no clear line as to when the temporary job became an indefinite one. Petitioner apparently recognized that the job would be of a longer duration than the usual Southern assignment when, after he had been employed in Spartanburg for about eight months, he moved from a motel room, which he rented by the week, into a trailer home. Taking this fact into consideration, it is the opinion of the Court that the petitioner's job became one of indefinite duration not later than September 1, 1972. See ;Petitioner's traveling expenses will be allowed proportionately for the taxable year 1972. For taxable year 1973, petitioner was employed for an indefinite period. Accordingly, no traveling expenses will be allowed petitioner for 1973. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- * * *
(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; * * *↩